## Trainer *v.* Trainer Spinning Company, Appellant.

*Master and servant—Wrongful discharge—Corporation—Manager— Corporate resolutions—Evidence—Case for jury.*

In an action against a corporation by its former manager to recover salary after an alleged wrongful discharge, it appeared that a resolution was passed giving the plaintiff a leave of absence for a limited period, and that another resolution was passed four days later, finally discharging plaintiff on the ground of insubordination. There was testimony that the plaintiff before the second resolution was passed refused to take the vacation offered to him, and also refused to permit another person to act in his place. The ground for discharge was insubordination. *Held*, that the case was for the jury, and that a verdict and judgment for plaintiff should be sustained.

Argued Feb. 8, 1909. Appeal, No. 199, Jan. T., 1908, by defendant, from judgment of C. P. Delaware Co., Sept. T., 1906, No. 153, on verdict for plaintiff in case of William E. Trainer

v. Trainer Spinning Company. Before FELL, BROWN, MESTRE-ZAT, ELKIN and STEWART, JJ. Affirmed.

Assumpsit for salary. Before JOHNSON, P. J.

The court charged in part as follows:

It appears that some time in August, 1906, there was some difficulty in that corporation and that difficulty in some way related to continuing Mr. Trainer, the superintendent, in his position as superintendent and manager. The real difficulty, whatever it may have been, does not very clearly appear, but on August 6, 1906, the company passed this resolution:

"Mr. James S. Austin.—Mr. Austin, one of the directors, at a meeting of the corporation, 'moved that Mr. Trainer be given a vacation for three months, with his salary, from the 6th of August, 1906, and that in the interim the mill be managed by the President or such superintendent or manager as he may designate, provided that at the expiration of the three months Mr. Trainer shall not again take up the work or manage or superintend until further action by the Board of Directors.'"

That resolution was passed. On that day or the next day, I am not very clear which, and I do not think the president testified, he called at the mill on Mr. Trainer.

He went to the mill after the passage of this resolution, went alone, if I remember, on the first occasion, and had a conversation with the superintendent. You remember what was said. If I got the president aright his mission was, as he said, to coax or persuade Mr. Trainer to take a vacation. I do not remember any evidence that he demanded possession of the mill, but that he wanted him to accept the suggestion in this resolution that he take a vacation. Mr. Trainer declined to do it, and he went away. I understand there is no complaint upon the part of the defendant of this interview, but there may be. It will be for you to say whether there was anything in that interview that was contumacious upon the part of Mr. Trainer, or that evinced any effort to defy or disobey the order of the president if any order was given.

[I do not recollect that any demand was made by the presi-

dent for him to give up the mill or to go away, but my recollection is he tried to persuade him it would be better for him that he take this vacation. However, he went away. The next day he returned, if it was the next day, with a gentleman named Turner, George C. Turner, who, it is alleged by the defendant, had been selected as the manager or superintendent to take the place of Mr. Trainer, and the contention of the defendant is that Mr. Trainer refused to accept this man as the superintendent, and turn over the mill to him, and because of that refusal they had the right to discharge him. That is the contention of the defendant;—that they produced to him at the mill his successor, and that he refused to obey the orders of the board of directors and of the president, and, therefore, they had a right to discharge him.

If I remember that testimony it was like this: That the president and Mr. Turner went to the mill; at the gate was a Mr. Pierce, a watchman employed by the superintendent, Trainer, and that he let him in, but that Mr. Trainer refused to permit Mr. Turner to enter. I do not recollect any testimony upon the part of the president or Mr. Trainer informing Mr. Trainer that this was the superintendent and that he was there to take his place, and it does seem to the court, though you are not bound by this suggestion, that in the presence of the dubious character of this resolution of August 6, that if it was the intention of this president to present a superintendent which he had selected, for he was authorized under the resolution of August 6, to select one, that he ought to have said to Mr. Trainer: "I have selected this gentleman to take your place, and I ask you or demand of you," or something, "to surrender the property to him." I do not remember a particle of evidence whether— was there any evidence showing that Turner had been appointed?

Mr. Hannum: Not at that time.

The Court: I mean at that time.

Mr. Dickinson: What Mr. Hannum's reference to was his election to the position of manager, but the first resolution was, if the court will remember, "any manager or superintendent selected by the president."

The Court: Is there any evidence he had been selected by the president?

Mr. Dickinson: Certainly. Mr. Blythe testified to it and Mr. Trainer testified point-blank that he told Mr. Blythe in so many words, "I will admit you or any officer of the company, but I will not admit Mr. Turner," who was the new manager.

Mr. Hannum: Oh, he did not say that.

The Court: Just as I say, it will be for you to say whether there was any evidence, first, that the president had appointed Turner at that time, and whether when he got there he informed Mr. Trainer that Turner had been appointed by him, because there is nothing on the minute to show, had been appointed by him as the manager and gave him plainly to understand that this was a demand for this property, because we would be inclined to the view that if there had been a man, a superintendent, appointed in his place, and he had appeared by the president, and Mr. Trainer had been told that he had been removed from his office, and this was his successor, that he would be bound to take notice of it and would be obliged to surrender it. But it was the duty of the defendant to make that clear. Now, was it clear? And did the superintendent and did the company believe at that time that the resolution of August 6, was intended as a dismissal, as a discharge?] [4]

Both counsel for the plaintiff and the defendant conclude that this was not a discharge; that this was an offer or a direction to Mr. Trainer to take a three months' absence, but they informed him that his work would end at the end of three months unless the board should otherwise determine.

So that first, was it clear to Mr. Trainer who was present when this resolution was passed that this was intended to dissolve his connection with this business or that it was optional with him whether he should take three months' vacation or not?

Now, the resolution of August 9, throws some light upon this question. Evidently after the president had returned the board concluded that something else had to be done to get possession of the property, and they passed this resolution: "Be it resolved that the resolution adopted on August 6, which was as

follows: That William E. Trainer be given a vacation of three months with his salary, and that in the interim the mill be managed by the President or such Superintendent or manager as he may designate, provided at the expiration of the three months Mr. Trainer shall not again take up the work as manager or superintendent until future orders by the Board, be revoked, rescinded and declared null and void, and that the said William E. Trainer be and is hereby discharged as superintendent and manager of the mill, his discharge to date from this date, August 9, 1906."

Now it is quite plain from this resolution that the corporation, the company, was not intending or inclined to stand upon the resolution of August 6 as a dismissal. Whether they thought it was dubious or not no one knows, because, as Mr. Dickinson says, "We can't give in evidence what was talked about before the resolution was passed," but it was a fact that then they did pass a resolution not only revoking this former resolution but dismissing him. The president went down to the work and Mr. Trainer, under this resolution of revocation, surrendered the premises.

[Now, it will be for the jury to say whether or not this company was justified in discharging him for any reason that took place, either at the first interview by the president after the passage of the resolution of August 6, or the second. If the jury find that there was nothing in that that justified the company for discharging him, then he is entitled to recover. The president says, as I understand, that he had a conversation with the constable about what the constable would do if he sent him a letter. You remember what he said. He said he was there to keep people from taking forcible possession of the premises, and that he was employed by Mr. Trainer, and that was his duty. Now, I do not pay very much regard to what the constable said to the president at all. The constable might have said anything he pleased. True, he was there in charge, but he said that his duty, and he said it was in writing, was that he should keep people from taking forcible possession of the premises, and the conversation that he had with the president after he had gone out was not very pleasant. Still, it is

the act of Mr. Trainer and not the act of this constable that is to justify this corporation in discharging him, if they are to be justified at all. You are not to take the view of the court that this conversation with the constable has but little bearing upon this question, it has some. It will be for you, but the court does not see that it has a very great bearing upon this controversy, because it is the act of Mr. Trainer when this president went there on these two occasions, for that is when the trouble arose. Was there anything upon his part, any act that justified this corporation in rescinding this contract? For that is what they did.] [5] And in passing upon this question, look at these minutes; pay attention to the testimony of the president and all the other witnesses and of the plaintiff, very few witnesses, and if you conclude that there was a hiring here for five years or a hiring for one year, and that the discharge was made during the term without a justifiable and a reasonable cause then this plaintiff is entitled to recover $1,875 and the interest.

Verdict and judgment for plaintiff for $1,972.50. Defendant appealed.

*Errors assigned* amongst others were (4, 5) above instructions, quoting them.

*O. B. Dickinson*, with him *M. W. Sloan*, for appellant.

*Kingsley Montgomery*, with him *John B. Hannum*, for appellee.

OPINION BY MR. JUSTICE ELKIN, March 8, 1909:

In 1902, Sloan, a promoter, being desirous of organizing a spinning company, made a proposition in writing to appellee stating the terms upon which he could become a subscriber to the capital stock of a company to be afterward incorporated for the purpose indicated, of which company Trainer was to be manager for a term of five years at a salary of $2,500 per year. The appellee accepted the proposition, complied with all the requirements and was selected by the board of directors as manager and continued to perform his duties as such for a

period of four years and three months, when differences arose between the manager and some officers of the board which resulted in his discharge. This suit was brought to recover the balance alleged to be due him for that portion of the last year of his term of employment in which he was not permitted to continue as manager. His right to recover is denied because of his discharge under circumstances claimed to be justifiable. The testimony shows that business differences arose between the members and officers of the board in reference to the management of the company which culminated in the resolution of August 6 being adopted, and this was followed by the resolution of August 9. The principal contention here is that the resolution of August 6 was not a discharge but the grant of a leave of absence for a limited period on full pay, and that the rescinding of this resolution and the final discharge four days later on the ground of insubordination was justifiable and is sufficient to defeat a recovery in this action. These, however, were all questions for the jury, and unless there was substantial error in their submission the verdict should not be disturbed. We have concluded after very careful consideration of the whole record that no reversible error was committed at the trial or in the charge to the jury. While the resolution of August 6 standing alone might not be considered an absolute discharge, taken in connection with subsequent events and all other circumstances relating thereto, it must be considered the beginning of the end so far as his services as manager are concerned. It in substance said to the manager, your services are no longer needed and you must prepare to sever your relations with this company. He so understood it and so must the other members of the board have intended it. What occurred but a few days later leaves no room to doubt that this was the intention of all parties concerned. Under these circumstances the jury could very properly take into consideration the resolutions of August 6 and 9, and all other facts developed at the trial in order to determine whether there was just cause for the discharge. The learned trial judge submitted all these questions to the jury in such a manner as to clearly indicate what the issue between the parties was and the grounds upon

which the various contentions were based.  It was a question of fact for the jury, and in our opinion nothing occurred at the trial to justify a reversal of the judgment entered on the verdict.

Judgment affirmed.